**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HOPE HOUSE IN MIDLAND PA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:24-cv-00456-CB |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| BOROUGH OF MIDLAND, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

**I.  MEMORANDUM**

Plaintiff wishes to open a homeless shelter for women and children in Midland, Pennsylvania.  As the state trial and appellate courts recognized, this is an admirable and worthy cause.  *See* Doc. 45-18 (Ct. of Comm. Pls. opinion); Doc. 45-19 (Pa. Commw. Ct. opinion).  Unfortunately, that was not enough in the state proceedings, nor is it here.  There is no reason to believe that the Borough of Midland's disallowance had anything to do with religion.  Defendant's Motion (Doc. 42) for summary judgment will be granted.

The parties are familiar with the facts and the law, and the Court writes for their benefit only.  Plaintiff's case suffer two inconvenient truths.  First:  At all stages of the local and state proceedings, Plaintiff framed its challenges under the rubric of disability rights – not religious exercise.  Its proposed curative amendment to Midland's zoning ordinance contemplated use of the property as a "Community Living Arrangement," allowing "persons with handicaps and/or disabilities" to have "equal access to resources such as schools, community centers, jobs, etc."  Doc. 45-13 at 1.  Plaintiff's counsel alleged that Midland's zoning ordinance failed to provide

"reasonable accommodation for such a use," thereby "creat[ing] discriminatory classifications" and rendering it "unconstitutional and exclusionary." *Id.*

As recognized by the state courts, Plaintiff's evidence regarding prospective residents' disabilities was "squishy," at best. Doc. 45-18 at ECF-header pg. 4 of 11 ("Hope House alleged that some residents will have mental disabilities, but the evidence was not firm."). The appellate court summarized the testimony of Plaintiff's executive director, Ms. Baker, at the Borough's public hearing. Doc. 45-19. The intended use was to "operate a shelter for women and children who need housing." *Id.* at pg. 3 of 18. It would not be "limited to individuals with disabilities," although it was "poss[ible]" that some residents may suffer "mental illness," addiction issues, or learning or physical disabilities. *Id.* at 4-5.

To be sure, Ms. Baker did reference "biblical counseling," *id.* at 4, and testified that Plaintiff's mission was "to equip and empower women who need resources, shelter and hope in Christ." Doc. 45-15 at pg. 10 of 115. But the suggestion that religion played an operative role is unfounded. This was a deliberate choice, because the proposed amendment would not apply to Plaintiff alone. Pursuant to state law and procedure, Plaintiff was required (and guided by Borough agents, to be fair) to seek a revision that would extend to future property-holders, whose land-use rights are expansively construed. *See* Doc. 45-19 at pg. 8-9 (in Pennsylvania, ordinances are interpreted to "afford[] the landowner the broadest possible use and enjoyment"). Plaintiff's assertion of religious rights, under RLUIPA or otherwise, is a new approach, now that its hopes for state-relief have all but extinguished.

Second, Plaintiff purchased the property in question knowing, full well, that the intended use presented zoning issues. Although Ms. Baker testified that the purchase was made in December 2020, the sales agreement – in fact – was consummated in July 2020. Def.'s Facts

(Doc. 44) at ¶ 29; Pl's Response (Doc. 51) (admitting same).  Indeed, it is undisputed that

Plaintiff purchased the property notwithstanding board-members' having specifically raised

concerns.  In an email sent the day before he signed the sales agreement, president Vince

LaValle question the wisdom of "buying the house 'as is[,]' with no contingencies" should

"zoning become[] an issue."  Doc. 45-8 at pg. 1 of 3.  Board-member Clara Montanari, a licensed

but non-practicing lawyer, responded:  "I think Vince raises a significant issue with entering into

any sort of contract prior to knowing that the zoning approval has been completed."  *Id.* at pgs.

1-2.

      The discussions apparently went no further, at least as reflected in the record.  Caution,

it seems, was thrown to the wind.  Plaintiff appears to have ascribed to the notion that it is better

to ask forgiveness than permission – a sentiment likely informed by Plaintiff's benevolent

intentions, and the purchase price ($35,000).  Doc. 45-7 (sales agreement); *cf. also* Doc. 52-8

at pg. 2 of 3 (email from Ms. Baker the following month, "[a]s a board, let's continue to pray"

that "Hope House [will] find favor in the eyes of those making these decisions[ and] that hearts

will be softened to [our] mission in Midland").

      These two shortcomings are eerily similar to those presented in Allentown Victory

Church v. City of Allentown, Pa., the Court of Appeals for the Third Circuit's most recent

(non-prisoner) RLUIPA decision.  *Id.*, 2024 WL 3439772 (3d Cir. Jul. 17, 2024).  The decision

is highly persuasive given the dearth of published authority in this Circuit, particularly within the

non-prisoner context.  In Allentown, the plaintiff's facility provided housing for men seeking

recovery upon release from jail or a substance abuse treatment facility.  *Id.* at *1.  It provided

"mandatory, faith-based programming for its residents."  *Id.*  The district court entered summary

judgment against the plaintiff on its RLUIPA claim, and the Circuit Court affirmed.

The Allentown Court's recitation of material facts was modest, so the points it chose to emphasize are telling. Among them was the plaintiff's having framed its state challenge under the rubric of disability law. *Id.* The plaintiff proved unsuccessful, and the Court highlighted that, "despite the [unfavorable] decision," the plaintiff subsequently entered a new lease agreement, then sued the city. *Id.* at *2. Under those circumstances, the Court found that "the administrative record [did] not demonstrate" a violation of RLUIPA. *Id.* at *1. The plaintiff had failed to show that the city's decision placed "a burden on religious exercise, substantial or otherwise." *Id.* at *6.

The same is true here. There is no evidence that Midland's determination was influenced by Plaintiff's religiosity, positively or negatively. In fact, Plaintiff's conscious decision to pursue the amendment through a secular framing defeats its prima facie claim of "religious exercise." Thus, the Court need not reach the question of substantial burden. Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 663-64 (10th Cir. 2006) (where the plaintiff fails to show that it engaged religious exercise, "the substantial burden issue [is] irrelevant").

The Court realizes that "religious exercise" under RLUIPA is broadly defined. Pl.'s Opp'n Br. (Doc. 50) at 14 (collecting authority). Nevertheless, with Plaintiff's decision to frame its challenges under the rubric of disability, not religion, its current invocation of the latter is unconvincing. *Compare* Allentown at *1 (focusing on whether "*the [state] administrative record . . . demonstrate[d] discrimination*" or "*a substantial burden on religion*") (emphasis added) *with* sources cited *supra* (identifying Plaintiff's purpose as providing "shelter for women and children who need housing"; failing to indicate that "biblical counseling" was mandatory,

unlike the "mandatory, faith-based programming" in Allentown, which still did not result in a "substantial burden"; and highlighting Plaintiff's consistent faith-neutral framing).

This finding, alone and independently, warrants a grant of summary judgment on the substantial burden claim (Count I).  Even were the Court to conclude otherwise, Plaintiff also fails to show a "substantial burdening," and this provides a wholly independent basis for granting summary judgment.  At the very least, Plaintiff's exclusive pursuit of the disability theory, through the entire local and state proceedings – only to "change[] tack"[1] here – significantly undermines its narrative that religion played a part.  The aspersion has no support in the record, and "[t]he Court is disinclined to [endorse] theories [that have] degenerate[d] into a strategy of, 'say anything to win.'"  France v. PNC Fin. Servs. Grp., Inc., 2013 WL 3279772, *4 n.5 (W.D. Pa. Jun. 26, 2013).

Plaintiff's frequent refrain regarding "factual disputes" does it little good, at least with respect to the "substantial burden" inquiry.  Although both sides have made a jury demand, the statute itself is silent on the point.  Many decisions have assumed a jury right, at least in cases where money damages are available.  None of the cases, as far as this Court can discern, gave the issue much thought.  Compare Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 273 (3d Cir. 2007) (remanding an "equal terms" claim under RLUIPA for the "District Court . . . to determine compensatory damages") (emphasis added) with id., on remand, 2010 WL 1491079 (D. N.J. Apr. 13, 2010) (assuming, without discussion, that compensatory damages were for a jury to decide).

---

[1]  Allentown at *1 (noting the plaintiff's similar change in position, albeit at the city board's suggestion).

The Court will not opine on whether RLUIPA, generally, includes a jury right.[2]  But the weight of authority dictates that the *"substantial burden" inquiry* is a question of law for the Court.  In a recent published decision, the Ninth Circuit court joined those of the First and Sixth Circuits in so concluding.  Spirit of Aloha Temple v. Cnty. of Maui, 132 F.4th 1148, 1155-56 (9th Cir. 2025).  The Court predicts that the same rule applies in this Circuit, especially given the binding authority in Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs., 867 F.3d 338 (3d Cir. 2017).  There, the Third Circuit held that the "substantial burden" inquiry under the Religious Freedom Restoration Act, the statutory progenitor of RLUIPA, presented a question of law; and it cited RLUIPA precedent in support of subsequent analyses.  *Id.* at 356, 360-61.

Plaintiff's frequent incantation of the "factual disputes" mantra, therefore, is less than persuasive.  In any event, though, the result is the same.  A proffer of additional evidence cannot overcome the Court's convictions that, (a) there was no religious exercise in the state proceedings, and (b) there was no substantial interference either way.  The Court also disagrees that *genuine* issues of material fact have been shown, regarding *any* of Plaintiff's claims, and the Court separately and independently so holds.

_____

[2]  Although many more decisions presume a jury right than the converse, the answer may be less clear than it appears.  In addition to land-use rights, RLUIPA also covers incarcerated individuals.  In that context, the unavailability of money damages often answers the question.  Cordero v. Kelley, 2022 WL 212828, *2 (3d Cir. Jan. 24, 2022) (RLUIPA "does not allow for recovery of money damages") (citing Sharp v. Johnson, 669 F.3d 144, 154 (3d Cir. 2012)).  Compensatory damages may be awarded from the bench, however, and courts have awarded them under statutory schemes wherein the lack of a jury right goes unquestioned.  *See, e.g.*, Advanced Fluid Sys., Inc. v. Huber, 958 F.3d 168, 173 (3d Cir. 2020) (affirming bench trial award of compensatory damages); Scorsone v. United Food & Com. Workers Union Local 1245, 87 Fed. Appx. 236, 238-39 (3d Cir. Jan. 7, 2004) (affirming bench trial award of compensatory damages in ERISA benefits case).  Absent other guidance, courts look to whether the statute's damages provisions or legislative history elucidate.  F.P. Woll & Co. v. Fifth & Mitchell St. Corp., 2005 WL 1592948, *3 (E.D. Pa. Jul. 1, 2005).  If not, the court engages a constitutional analysis.  *Id.*  Such determinations are unnecessary here, and any conclusions would be dicta.  That said, assumptions are no substitute for analysis.

As to the merits of substantial burden, the second shortcoming raises its head, in a significant (if not dispositive) way. Plaintiff executed the sales agreement with clear knowledge that there was "a significant issue with entering into any sort of contract prior to knowing that the zoning approval has been completed." *See* record evidence, quoted *supra*. Self-inflicted harm cannot meet the substantial burden requirement—the case decisions are legion. Andon, LLC v. City of Newport News, Va., 813 F.3d 510 (4th Cir. 2016) (delay, uncertainty and expense resulting from the city's denial of a zoning variance did not establish a substantial burden, because the plaintiff knew that the variance likely would be denied; its lease agreement, wisely, was conditioned on approval; and "[a] self-imposed hardship generally will not support" a RLUIPA claim, because "the hardship was not imposed by governmental action altering a legitimate, pre-existing expectation" that the property-use would be permitted) (citations, here and hereafter, omitted); *accord* Livingston Christian Sch. v. Genoa Charter Twp., 858 F.3d 996, 1009 (6th Cir. 2017) (the plaintiff's actions were taken "after [a] special-use permit application . . . was denied," and "a burden is not substantial when the plaintiff imposes that burden upon itself"); Chabad of Prospect, Inc. v. Louisville Metro Bd. of Zoning Adjustment, 623 F. Supp. 3d 791, 802 (W.D. Ky. 2022) (action taken two months after the enactment of an unfavorable ordinance caused self-imposed harm to "a significant degree," and "a pre-existing restriction generally cannot amount to a substantial burden"). Although the Third Circuit in Allentown did not explicitly reference this principle, the implication is obvious. *See* discussion *supra* (of the facts identified in the Court's modest recitation was the plaintiff's entry of a lease *after* the city's unfavorable decision).

Plaintiff also claims that Midland's mayor and two council members communicated that it would be permitted to use the property as intended. Doc. 51 at pg. 24 of 43 at ⁋ 8.

But those individuals were not involved in zoning decisions; nor did they have the authority to bind the zoning board. More importantly, their alleged assurances were insufficient to quell the reasonable concerns expressed by Plaintiff's president, and Ms. Montanari, *one day before closing the sale*. *See* record evidence, discussed *supra*.

In light of the Midland Planning Commission's letter dated April 30, 2021, the board members' caution proved warranted. The letter, received long after Plaintiff's purchase and before its public hearing, stated:

> While there is no opposition to the proposed use, the members agree[] that there need[s] to be more conditions or regulations applicable to such use. . . .
> The proposed amendment, in its current state, is too broad[,] creat[ing] the potential for unsafe living conditions for residents[, and m]any of [the Planning Commission's proposed] regulations [already exist] in the Zoning Ordinance under Section 401(M) regarding approval for a Group Residence in the R-3 Zoning District.

Doc. 45-16.

The Commonwealth Court acknowledged that, while "local government officials [previously] may have steered Hope House in the wrong direction," *see* Doc. 45-19 at pg. 17, this is a common feature reflected in the case law. It did not influence the state court determinations, nor has it affected the outcome in RLUIPA cases. *See, e.g.,* Allentown (noting that the plaintiff's change in strategy was made "at the [city-b]oard's suggestion"). Plaintiff's case is distinguishable from ones where a property-holder detrimentally relied on government conduct creating a "reasonable expectation of religious land use." *See generally* Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Md., 915 F.3d 256, 261 (4th Cir. 2019); *compare* Redemption Cmty. Church v. City of Laurel, 333 F. Supp. 3d 521, 534-35 (D. Md. 2018) (the plaintiff had a reasonable expectation, having invested $470,000 in a venture that was "allowed to operate within [the] zone as matter of right" until a later amendment) *with*

Canaan Christian Church v. Montgomery Cnty., Md., 491 F. Supp. 3d 39, 59 (D. Md., 2020)

(wherein the same court found no reasonable expectation because the plaintiffs were aware that

"approval [was] either unlawful or highly unlikely to succeed," and they previously had

"attempt[ed] and fail[ed] to secure approval"), aff'd, 29 F.4th 182 (4th Cir. 2022).

Also distinguishable, and unpersuasive, are the decisions considering the property-

holder's financial means.  In the undersigned's view, the consideration introduces a variable

outside of local government's control; and, theoretically, conduct visited on an entity of limited

means may support a claim, while the same conduct against a well-funded comparator would

not.  The Court does not believe that such a discrepancy would be anticipated, or countenanced.

Rather, financial condition has been considered under the "totality of the circumstances" test,

inapplicable in this Circuit; and when the government conduct was dubious in other respects.

See, e.g., Immanuel Baptist Church v. City of Chicago, 700 F. Supp. 3d 604, 613-14 (N.D. Ill.

2023) (noting that the plaintiff was "a small church [of] limited resources," but also that the city

"for years" had not taken "any enforcement or punitive measure against the Church or landlord

with regard to parking"; the city did not prevent the church from holding its services there;

and "[t]wo official city documents reassured the Pastor" there was no problem – a "letter from

the City's Bureau of Planning and Zoning" stating that "the establishment of a religious

assembly use [was] permitted," and "an occupancy permit issued by the City to the Church");

Micah's Way v. City of Santa Ana, 2023 WL 4680804, *6 (C.D. Cal. Jun. 8, 2023) (applying the

Ninth Circuit Court's "totality of the circumstances" standard to find "plausibl[e] alleg[ations of]

substantial burden" at the 12(b) stage, because the plaintiff "likely could not afford to move to a

new location," and "[e]ven if [it] could," the mayor stated his intention to "prevent [the plaintiff]

from operating 'anywhere else in the city'").

This Court believes the financial inquiry has resulted from a natural inclination towards "bootstrapping," or perhaps a lack of imagination.  *See* discussion *supra* (questioning whether financial condition ever can or should be outcome-determinative).  Absent indications that the government's conduct against a property-holder was *specifically tailored* to exploit its limited means, the consideration should be viewed with skepticism (if not categorically rejected).

In any event, the precedent cited by Plaintiff is distinguishable – for the reasons above; given its exclusive emphasis on disability in the state proceedings; and the complete lack of evidence or inference that religion played a part in the decision-making process.  Plaintiff's opportunistic invocation of RLUIPA falls at the other end of the spectrum.

Plaintiff's reliance on precedent considering whether there are "practical alternative" locations is somewhat less problematic, but equally distinguishable.[3]  *See, e.g.*, Islamic Ctr. of Miss., Inc. v. City of Starkville, Miss., 840 F.2d 293, 302 (5th Cir. 1988) (in this pre-RLUIPA case, "the [c]ity advanced no rational basis other than neighborhood opposition to show why

---

[3]  To be clear, neither Plaintiff's counsel nor the Court's independent research has identified a Third Circuit Court opinion considering this factor.  Assuming the Circuit Court would indulge it, the cases cited by Plaintiff are distinguishable.  *See* discussions to follow.  The Court is not at all convinced that this factor, alone or in combination with the questionable inquiry into Plaintiff's financial condition, is enough to meet its burdens.  Unlike the cases cited by Plaintiff, this one is bereft of *any* evidence or indication that religion played a part.  And none of them leaves so strong an impression that the invocation of RLUIPA is an eleventh-hour ploy to "win" by any means necessary.  Finally, even assuming the Court is wrong on all of these points, Plaintiff bears the burden of proof on the alternative options factor, and it has introduced no evidence to meet it.  *Compare* Spirit of Aloha, 132 F.4th at 1156 (under the "totality of the circumstances" test, the plaintiff bears the burden regarding "ready alternatives") *with* Doc. 50 at 18 (citing no evidence regarding a lack of alternatives, but instead attempting to poke holes in defense witnesses' deposition testimony, regarding matters not presented in furtherance of summary judgment).  The proposed shelter – had Plaintiff been prepared to meet Midland's reasonable (and, frankly, necessary) regulations – was permitted in zone R-3.  And there were four distinct "R-3" sections for Plaintiff to investigate.  Doc. 45-15 at pg. 72; Doc. 45-1 at pgs. 50 & 52 of 52 (zoning maps).  There is no evidence to indicate they did so for any.

*the exception granted all other religious centers* was denied the Islamic Center") (emphasis

added); Al Falah Ctr. v. Twp. of Bridgewater, 2013 WL 12322637, *7 (D. N.J. Sept. 30, 2013)

(existing residents exhibited hostility, a defendant council member urged the plaintiff to build its

mosque elsewhere, and stated that, even if the application was approved, "future applications

[for] modifications . . . would be heavily scrutinized"); City Walk - Urban Mission Inc. v.

Wakulla Cnty. Fla., 471 F. Supp. 3d 1268, 1283-86 (N.D. Fla. 2020) (distinguishing the "several

[other] cases" where courts found that relocation, while inconvenient, did not amount to a

substantial burden, because in City Walk:  the plaintiff's intended use was foreclosed throughout

the entire county; "the record [was] devoid of facts indicating that [the p]laintiff knew that it was

not allowed" to use the property as intended; and, "[t]o the contrary, Plaintiff sought clarification

from the County's Planning and Zoning Department before opening its transition home,"

and "the Department informed Plaintiff that its use qualified as a family care home," permitted

under the code).[4]

     In light of the significant shortcomings above, Plaintiff's attempts to meet the Third

Circuit's "substantial burden" standards ring hollow.  Its contention that Midland "forced"

---

[4]  Although none of the cited precedents gets Plaintiff where it hopes to go, Int'l Church of
Foursquare Gospel v. City of San Leandro, 673 F.3d 1059 (9th Cir. 2011) provides *slightly* more
grounds for debate.  There, the circuit court reversed a grant of summary judgment, because:
the district court erred in summarily rejecting *the plaintiff's* evidence, from its realtor and a
former city manager, regarding the unavailability of alternate sites; the city's claimed need to
"preserve properties for industrial use" was undermined by the relevant "marketplace['s] . . .
welcom[ing] the p]laintiff," as evinced by its "ab[ility] to purchase the . . . property"; the district
court "improper[ly] scrutin[ized] the Church's core religious beliefs," where the property's
intended use was "*a place of worship*"; and the city's rejection of the plan – because the property
was within a quarter mile of 19 businesses with hazardous materials business plans ("HMBP") –
was highly suspect, given that *all 196 parcels* in the zone were within 1/4 mile of an HMBP-site.
Id. at 1067-70 (emphasis added).  The fact pattern in Foursquare would give *this* Court
significant pause, and a trial likely would have been required.  Under the fact pattern in this case,
not.

Plaintiff to choose between following religious precepts "and forfeiting benefits otherwise generally available" – or "abandoning" precepts in order to receive a benefit[5] – collapses on utterance. Hope House abandoned nothing. Midland's ordinance forbade it from operating a homeless shelter, or group home, in its R-1 zoning district – as it would any aspiring provider. This was true regardless of the property-holder's religious affiliation or lack thereof.

Equally spurious is Plaintiff's contention that Midland "put[] substantial pressure on" it to "substantially modify [its] behavior and to violate [its] beliefs." *Id.* Midland did nothing but require Plaintiff to follow its zoning regulations. Assertions like Plaintiff's could be leveled by any religious entity disappointed with a zoning decision. Counsel's accusation that Defendant threatened Plaintiff with legal action, in 2023, is particularly rich – given that the alleged "threat" came after years of appellate litigation driven by Plaintiff; and the fact that *evidence offered on its own behalf* references similar "threats" in the opposite direction. *Compare* Doc. 52-11 (letter of former defense counsel, dated Jan. 3, 2023, advising that attempted "use [of] the property for any purpose . . . not in accordance with *the [Pennsylvania] courts' rulings*" would "result in vigorous enforcement action") (emphasis added) *with* Doc. 52-9 (same counsel's letter of Nov. 17, 2023, stating: "In light of the threat by Hope House to sue the elected officials in their individual capacities, they are reluctant to have an informal discussion with your client.").

Plaintiff has failed to show Defendant substantially burdened a bona fide exercise of religious expression. This is so as a matter of law, and the presentation of additional evidence would be a waste of time and resources. Its only other colorable challenge is under RLUIPA's "equal terms" provisions (Count II). That theory fares no better.

---

[5]  Allentown at *6 (citing and quoting Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007)).

Here highlights a <u>third</u> fundamental disconnect in Plaintiff's case.  Not one accusation here would be unavailable to a secular organization.  Efforts to house the homeless are not the exclusive domain of the faithful.  The Court agrees with Plaintiff's counsel, though:  the street runs both ways.  A religious organization's pursuit of goals achievable through secular means does not disqualify it from protection under the statute.  Doc. 50 at 14.

But this misses the point.  Under Lighthouse, the "equal terms" inquiry focuses on whether a secular comparator is similarly situated *as to the regulatory purpose of the regulation in question*.  Id., 510 F.3d at 264.  It is within this context that Plaintiff becomes indistinguishable from a secular counterpart.

Again, there is not one shred of evidence showing that, where Plaintiff's proposal was rejected, a secular entity's proposal would have been permitted.  Plaintiff counsel's analogies – to duplexes, triplexes, a charter school and a performance center (separate or combined) – fall flat.  These were not shelters or group homes.  The purposes behind the regulations do not touch them.

As to the purposes, they were well-identified in the state proceedings.  Section 401(M) of the ordinance makes them crystal clear.  Among other things:

> Group residences and intermediate care facilities shall [comply with enumerated dimensional requirements] and shall not be approved unless plans prepared by an architect or engineer are submitted which clearly indicate that adequate light, ventilation and fireproofing are provided, and that the dwelling facility and its accommodations shall be functional and convenient with regard to the specific needs of the group to be housed in the facility.  [They may] be approved only after Council has found that plans and programs for management of the group residence or facility are adequate and appropriate to the population to be housed and that adequate provisions have been made to assure the safety and welfare of the residents . . . and of the adjacent neighborhood.

Doc. 45-1 at pg. 23 of 52.

13

The requirements were no mystery.  Midland's planning commission spelled them out in a letter, sent before the hearing.  Doc. 45-16.  Chairperson Peter Quinn quoted them, verbatim, and noted the commission's determination that "there need[ed] to be more conditions or regulations applicable to such use."  *Id.*  He clarified that, absent the listed safeguards, the "potential" result was the residents facing "unsafe living conditions."  *Id.*

These concerns were echoed at the hearing.  Plaintiff's executive director, Ms. Baker, had no choice but to concede, the property had only three commodes and two showers. Doc. 45-15 at 49.  It does not take an expert, only the common experience of sharing a residential bathroom, to know:  the facilities were insufficient to accommodate the needs of 15 (let alone 17) people.  They were not "functional and convenient with regard to the . . . needs of the group," or any group of that size, "housed in the facility."  They were not "adequate and appropriate to the population," nor could they "assure the safety and welfare of the residents." The health and hygiene concerns were too obvious to ignore.

The bathroom problem is only the most obvious one.  Plaintiff did not agree, promise or even aspire to meet the various other regulations to assure the safety and welfare of its potential residents.  No confirmation that "adequate light, ventilation and fireproofing" would be provided; that the "accommodations [were] functional and convenient with regard to the specific needs of the group"; and no "plans and programs" to ensure "the safety and welfare of the residents."[6]

---

[6] Ms. Baker did a good job of explaining the safety measures accounted for by Hope House. Doc. 45-15 at pgs. 13-19 (around the clock supervision would be provided, security cameras installed, residents prescreened and drug-tested, counseling provided and referrals made for services not handled in-house).  The Court does not mean to suggest that Plaintiff was unserious regarding implementation.  It is one thing to be serious regarding some aspects – whereas coming into compliance with all local, state and federal regulations is another.

These requirements were not cockamamie exercises in hoop-jumping. The Court doubts that many shelters or group homes are permitted to operate without similar protections, in Beaver County, the Commonwealth or anywhere else.

The parties have fixated on whether a shelter may be permitted in zone R-1, and rightly so. The Court will address that issue in a moment. But even had Plaintiff identified a "perfect" property in zone R-3, it appears that the forest has been lost for the trees. Hope House must have been prepared to satisfy the provisions in section 401(M), including all required approvals. Although zoning ordinances are read permissively, *see* discussion *supra*, the applicability of section 401(M) cannot, with intellectual honesty, be debated.

It may be that Plaintiff was, or one day will be, prepared to take the necessary steps for compliance. A failure to do so would be to the detriment of the very people they wish to help. While supporters may believe that some shelter – any shelter – is better than none, the health and safety of the putative clients hang in the balance. And when someone in need is presented with an opportunity for housing, they likely will assume that the organization knows what it is doing, and has crossed its "t's" and dotted the "i's."

Plaintiff had no reason to present evidence regarding its expertise and capacity to handle these challenges, and the Court makes no assumptions. But its proposed curative amendment, as drafted, supplied no such protections. That they were not incorporated into the proposal leaves at least some grounds for skepticism.

As for the ordinance's requirements, Plaintiff wishes to narrowly focus on why a shelter was not allowed in R-1. The answers are revealed in the ordinance. Table 201 lists the three categories of residential zones:

R-1    "single family" residences

R-2    "two family" residences

R-3    "multiple family" residences

Doc. 45-1 at pg. 10 of 52 (capitalizations omitted).

Property sizes increased with the progressive categories. Some permitted and conditional uses were allowed in all of them. Ironically, given Plaintiff's present accusation, churches were a conditional-use allowed in each category. *See id.* Common allowances aside, each category added "size" to the previous one. R-1's unlimited-permission uses included a single family dwelling; R-2, single family and two family residences; and R-3, single family, two family, garden apartments and townhouses. Conditional uses: R-2 included the list in R-1, plus public buildings; and R-3 included the list in R-2, plus personal care homes, intermediate care homes and group dwellings. *See id.* Minimum lot areas increased, in correlation with the number of families. R-1's minimum lot size was 6,000 sq. feet (one family); R-2 was 8,000 sq. feet (4,000 per family x 2); and R-3 was 7,500+ sq. feet (2,500 x a minimum of 3 families, and potentially more).

The reasons for having separate zoning categories are obvious, and Midland's zoning officer, Owen Pella, referenced them at the hearing. *See* Doc. 45-15 at pgs. 66-68 (discussing the close proximity of the houses to one-another in R-1, and parking limitations). But the real problem, from the zoning board's perspective, was *the ripple effects of adopting the proposed curative amendment.* Mr. Pella highlighted that, if the amendment was adopted, Plaintiff's newly proposed classification, a "community living arrangement" ("CLA"), was not restricted by the ordinance's definition of "family." *Id.* at pg. 74. Under the ordinance, "family" expressly excluded "a group occupying a boarding house[ or] lodging house." Doc. 45-1 at pg. 43 of 52.

16

Sure enough, Plaintiff's proposed CLA classification was defined as a residence providing the "daily personal housing, social or rehabilitative services, counseling, support, care, or treatment exclusively for two (2) or more handicapped or disabled persons, including dependent children, not to exceed seventeen (17) total residents." Doc. 45-13. Given Plaintiff's actual goal – to provide shelter for homeless women and their children – and the (speculative) assumption that some residents would be "disabled" – the amendment's true intentions cannot be divined: does a CLA require that *all* residents (female or male, adult or child) be disabled? Or is the "two or more" requirement a trojan horse, whereby the property meets the definition so long as at least two residents, total, are "handicapped" or "disabled"? The planning commission's recognition that the proposed amendment was "too broad" appears an understatement. Whether unintentional or deliberate, the potential loopholes are large enough to drive a truck through.

Not only would the proposed amendment erode limitations framed in relation to family units, the new CLA classification would enjoy unfettered "permitted use[age]" in zone R-1. *See id.* In other words, CLAs would bypass the safety and welfare requirements in section 401(M). As Midland recognized, this result would be highly problematic – and, whether it was a result of poor drafting or for ultimate ease and convenience, only Plaintiff and its (then) counsel may know.

None of the case law addresses a proposal so untethered to the ordinance/regulation to offer a good comparison. And the strategy of presenting Plaintiff's request under the rubric of disability disrupts the identification of comparators. In assessing the purposes "of the regulation in question," the focus must be on the regulations evaded (whether through poor drafting or Machiavellian design).

Comparisons to duplexes, triplexes, a charter school and performance center (affiliated or unaffiliated) – even the temporary rentals to transient workers at the "Shell Cracker" plant – are inappropriate, they all miss the mark. Plaintiff has identified no comparators, secular or non-secular, real or hypothetical, who have been shown to evade the health and safety regulations required for the conditional use sought. Plaintiff's "equal terms" claim is all smoke and mirrors. And the case *still* has nothing to do with religion.

The reader, like the writer, likely is running out of steam – and the remaining theories are quickly dispensed. Plaintiff's "exclusion and limits" claim (Count III) never leaves the starting block. Midland hardly can be said to have "totally exclude[d] religious assemblies" from its jurisdiction, nor did it "unreasonably limit[] religious assemblies, institutions or structures." Churches are permitted in every residential zone. Plaintiff likely would have had an easier time opening a church. For that conditional use, section 401 articulates no pesky regulations.

Count IV – regarding land use regulations that discriminate based on religion or religious denomination – merely repackages prior arguments. They were unpalatable on first serving, and have not improved with reheating.

\* \* \*

As the Court previously intimated, Plaintiff's mission is a noble, and necessary, one. The shortage of resources for those among our most vulnerable populations is well documented. Whether the result of inadequate funding or prioritization (a distinction, it may be argued, without a difference), charitable organizations have been relied on to fill the gaps. Plaintiff's aspirations are as close to a pure "good" as humans are capable of. Hope House, its members

and supporters (counsel included) may hold their heads high, knowing they have done what they can in service of the mission.

Even the best intentions, however, cannot justify bending the law. The Court's dedication to it is sacrosanct. In Midland, there has been no disfavor for, or discrimination against, religion.

The extent to which ends justify means is a topic that has been debated by theologians and philosophers for centuries. Yet on that topic, the Court is unencumbered. Its commitment to the rule of law will not waver.

## II.  <u>ORDER</u>

Defendant's Motion for Summary Judgment (**Doc. 42**) is **GRANTED**.

September 30, 2025                                s/Cathy Bissoon            
                                                              Cathy Bissoon
                                                              United States District Judge

cc (via ECF email notification):

All Counsel of Record